KATHY W. ANTOON

                                   CIVIL ACTION

VERSUS

                                   NO. 10-088-BAJ-DLD

WOMAN'S HOSPTIAL FOUNDATION
d/b/a WOMAN'S HOSPITAL

## RULING

This matter is before the Court pursuant to a Motion for Summary Judgment filed on behalf of Defendant, Woman's Hospital Foundation d/b/a Woman's Hospital ("Defendant") (doc. 62). Plaintiff, Kathy Antoon ("Plaintiff"), opposes Defendant's motion (doc. 70). Defendant has replied to Plaintiff's opposition and Plaintiff has filed a Sur-reply (docs. 74, 77). Jurisdiction is based on 28 U.S.C. § 1331.

## BACKGROUND

The following facts, submitted pursuant to LR 56.1, have not been controverted as provided by LR 56.2 and are, therefore, deemed admitted for purposes of the present motion for summary judgment.[1]

---

[1] LR 56.2 provides:

> Each copy of the papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which there exists a genuine issue to be tried. All material facts set forth in the statement required to be served by the moving party will be deemed admitted, for purposes of the motion, unless controverted as required by this rule.

In February of 1988, Plaintiff was hired by Woman's Hospital as an ultrasound technologist (doc. 62-21, ¶¶ 1, 2). During her employment, Plaintiff performed, *inter alia*, ultrasound sonography ("ultrasounds") on in-patients and out-patients, including men, women, and children (*id.* at ¶ 4). When performing ultrasounds, Plaintiff and other ultrasound technologists produce images of the patient's anatomy as requested by referring physicians and/or radiologists and they note pertinent symptoms in order to relay the same to a radiologist (*id.* at ¶ 5). Ultrasound technologists observe and image, among other things, fetal development, anatomical abnormalities, and different types of diseases, including potentially cancerous masses and nodules (*id.* at ¶ 6).

Failure to accurately and thoroughly perform an ultrasound study can have potentially life-threatening consequences for a patient and the accurate and thorough performance of ultrasounds is important to the safety and well-being of patients (*id.* at ¶ 7).[2] Defendant provides ultrasound services to the public twenty-four hours a day, seven days a week. The regular business hours of operation for the Ultrasound Department, however, are Monday through Friday, 7:30 a.m. through 5:30 p.m. All remaining hours are handled by "call" shifts

---

[2] Though Plaintiff "denies" paragraph 7 of Defendant's Statement of Undisputed Facts, Plaintiff relies entirely on conclusory argument rather than evidence in her denial. *See* (doc. 70-1, ¶ 7). It is well-established, however, that "[t]he [non-movant's] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(internal citations omitted). Accordingly, Plaintiff has failed to carry her burden of establishing a genuine dispute of fact by controverting the facts and supporting evidence set forth by Defendant in paragraph 7 of the Statement of Undisputed Facts. The same reasoning applies wherever Plaintiff fails to direct the Court to specific evidence in the record to controvert the supporting evidence set forth by Defendant and the fact is deemed admitted pursuant to LR 56.2. Nonetheless, the Court, herein, recites only those undisputed facts that are material to this ruling.

covered on a rotating basis by Defendant's ultrasound technologists. Between June 2, 2008, and Ms. Antoon's termination on August 3, 2009, Defendant employed no more than seven full-time/part-time ultrasound technologists to cover all of the regular business hour shifts and to rotate coverage on the call shifts (*id.* at ¶ 9). All of Defendant's other ultrasound technologists, whether full or part-time, participated in the call shift rotation. On Monday through Thursday, call shifts begin at 5:30 p.m. and end the following morning at 7:30 a.m. The Friday call shift begins at 5:30 p.m. and ends at 7:00 a.m. on Sunday. The Sunday call shift begins at 7:00 a.m. and ends at 7:00 a.m. Monday (*id.* at ¶ 8). A night call shift worker is not required to remain at the hospital, but returns to the hospital to work as needed during the call shift. Thus, ultrasound technologists frequently work a call shift at night and then work their regular business hour shift the next day. (*Id.* at ¶ 10).

In June of 2008, Plaintiff presented to her employer a note from her physician stating that she was being treated for an emotional condition and asserting that the emotional strain of working call shifts on weeknights was hindering her improvement. The note further stated that it was "medically indicated" that Plaintiff should be removed from working weekday night call shifts. (*Id.* at ¶ 11). In June of 2008, the hospital reduced the number of weekday night call shifts worked by Plaintiff (*id.* at 14).

In approximately October of 2008, Defendant began receiving complaints from radiologists and the other ultrasound technologists that Ms. Antoon was

acting different, was forgetful, and was making mistakes, all of which led them to believe that Ms. Antoon's performance was compromising safety. Radiologists informed a member of the hospital's human resources department that, on some days, Ms. Antoon appeared to be drugged, was sluggish, was noticeably trying to process what she was being told, exhibited slurred speech, appeared to be sedated and in a fog, was forgetful, and was having a hard time focusing. The radiologists also informed Defendant that they were having to scan behind Ms. Antoon more frequently because she was missing obvious things, such as a miscarriage remaining in one patient's cervix and a nodule in another patient, and because she had mislabeled breasts on a number of occasions. (*Id.* at ¶17).

On February 5, 2009, Plaintiff received her first written warning and met with a representative from Human Resources and her supervisor, the hospital's Director of Imaging Services. During the meeting, concerns about Plaintiff's mistakes and reduced productivity were discussed. Plaintiff was informed that her performance would be monitored and re-evaluated in 90 days, and pursuant to her request, Ms. Antoon was to be provided with additional training between February 19, 2012 and February 26, 2012 with the ultrasound technologist of her own choosing on topics of her own choosing. (*Id.* at ¶ 20).

On February 23, 2009, the Chief of Radiology, Dr. Chester Coles, sent an email to the hospital on behalf of all of the radiologists, stating that they unanimously determined that Plaintiff should not be allowed to take call shifts because they had no confidence in her ability to work unsupervised or to be

alone with patients.. Dr. Coles also stated in a telephone conversation with a hospital administrator that the radiologists had observed numerous errors by Ms. Antoon over the preceding weeks and that he felt that patient care was being compromised. (*Id.* at ¶ 21).

Dr. Coles sent another email on February 26, 2009, on behalf of the radiologists, stating that "[i]t is our professional concern that Kathy Antoon is no longer able to perform her duties as a sonographer in accordance with accepted standards of care" (*id.* at ¶ 21, doc. 62-6, p. 6). The hospital then placed Plaintiff on administrative leave beginning February 27, 2009, and lasting until June 22, 2009, during which time she was paid, including pay for call shifts for which she otherwise might have been scheduled (*id.* at ¶¶ 22-23).

Upon her return, Ms. Antoon was not scheduled for any call shifts, however, fellow ultrasound technologists and the radiologists complained again of her performance issues, including: taking too long to perform ultrasounds, lack of familiarity with typical ultrasound equipment and procedures, using the wrong probe for a breast ultrasound, mislabeling, misplacing x-ray documentation, forgetting to print images, poor image quality requiring ultrasounds to be redone, failing to take routine images, appearing sluggish, failing to recognize and image suspicious abnormalities, failing to take all appropriate and/or requested anatomical areas based on the condition of the patient, failing to differentiate between normal masses and abnormal masses, and failing to correlate a

mammogram with the ultrasound findings in a patient with a potentially cancerous mass (*id.* at ¶ 24).

On July 7, 2009, Plaintiff was issued a second written warning and hospital administrators reviewed her errors with her. After receiving further complaints from radiologists, Defendant issued Plaintiff her third written warning and discussed specific performance issues with Plaintiff, including mislabeling, inability to identify ovaries, and her continued failure to recognize and image abnormalities. (*Id.* at ¶ 25).

After defendant received further specific complaints by radiologists concerning Ms. Antoon's performance, Dr. Ruiz and Dr. Gremillion met with hospital administrators and stated that the frequency of Plaintiff's mistakes was increasing and that her performance was placing patients at risk. The hospital administrators subsequently recommended termination of Plaintiff's employment and that recommendation was accepted. On August 3, 2009, the hospital terminated Plaintiff's employment in accordance with its Progressive Discipline Policy which provides that, after an employee has received three written warnings in a 12-month period, he/she is subject to termination for any subsequent performance issues in the same 12-month period. (*Id.* at ¶ 26).

Ms. Anton does not deny that the radiologists complained about her performance or that the radiologists honestly believed their concerns regarding her performance (*id.* at ¶ 27). Ms. Anton admits that none of the radiologists harassed or mistreated her and states that she "got along" with all of them (*id.* at

¶ 28). Ms. Anton does not deny that she made mistakes and admits that she was not disciplined unfairly for her mistakes (*id.* at ¶ 29).

Plaintiff filed her first charge with the Equal Employment Opportunity Commission ("EEOC") on March 13, 2009 complaining of disability discrimination. The Defendant received notice of the complaint that same day. (Doc. 70, p. 6).

On February 2, 2010, Plaintiff initiated this lawsuit, asserting that she suffers from "acute-anxiety disorder, post-traumatic stress disorder and major depression of the recurrent type" and alleging that Woman's Hospital's actions toward her constituted unlawful disability discrimination, disability-based harassment, and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, and the Louisiana Employment Discrimination Law ("LEDL"), La. R.S. 23:323 (doc. 1, ¶¶ 6, 36).[3] Plaintiff also alleges intentional and negligent infliction of emotional distress.

## ANALYSIS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In determining whether the movant is

---

[3] Because the ADA and LEDL provide similar rights and remedies, courts have used the ADA to analyze LEDL claims. *See Scott v. Turner Industries Group, LLC*, 2011 WL 5023840 (M.D. La. 2011); *Smith v. JP Morgan Chase*, 2011 WL 841439 (W.D. La. 2011*); Harvey v. Wal-Mart Louisiana, LLC*, 665 F.Supp.2d 655, 660 n.1 (W.D. La. 2009) (noting the Fifth Circuit's recognition of the similarity between the ADA and LEDL in *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 311 (5th Cir. 2009) and applying rulings with regard to the ADA equally to LEDL claims).

entitled to summary judgment, the court views facts in the light most favorable to the non-movant and draws all reasonable inferences in her favor. *Coleman v. Houston Independent School District*, 113 F.3d 528 (5th Cir. 1997). After a proper motion for summary judgment is made, the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2411, 91 L.Ed.2d 202 (1986).

The non-movant's burden, however, is not satisfied by some metaphysical doubt as to the material facts, or by conclusory allegations, unsubstantiated assertions or a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## 1. Disability-based Discrimination under the ADA

42 U.S.C. § 12112 provides, in pertinent part:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment.

The Fifth Circuit has provided the following guidance to courts evaluating a claim of disability discrimination asserted under the ADA:

> [W]here only circumstantial evidence is offered to show the alleged unlawful discrimination, we apply the *McDonnell Douglas,* Title VII burden-shifting analysis. *See Daigle v. Liberty Life Ins. Co.,* 70 F.3d

394, 396 (5th Cir.1995) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)). Under this framework, a plaintiff must first make a *prima facie* showing of discrimination by establishing that: (1) He is disabled or is regarded as disabled; (2) he is qualified for the job; (3) he was subjected to an adverse employment action on account of his disability; and (4) he was replaced by or treated less favorably than non-disabled employees. *See Burch v. Coca-Cola Co.,* 119 F.3d 305, 320 (5th Cir.1997), *cert. denied,* 522 U.S. 1084, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998). Once the plaintiff makes his *prima facie* showing, the burden then shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. Once the employer articulates such a reason, the burden then shifts back upon the plaintiff to establish by a preponderance of the evidence that the articulated reason was merely a pretext for unlawful discrimination. *See Daigle,* 70 F.3d at 396.

*McInnis v. Alamo Community College Dist.,* 207 F.3d 276, 279-80 (5th Cir. 2000).

Defendant contends, *inter* alia, that Plaintiff is not a qualified individual under the ADA because "her erratic performance and errors constituted a direct threat to patients' safety and well-being" (doc. 62, ¶ 3). Assuming, without deciding, that Plaintiff has set forth evidence to otherwise establish that she is a qualified individual with a disability, the Court notes that the ADA allows qualification standards including "a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace, and defines a 'direct threat' as a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." *Turco v. Hoechst Celanese Corp.,* 101 F.3d 1090, 1094 (5th Cir. 1996) (citing, 42 U.S.C. § 12113 (b)). Thus, "[a]n employee who is a direct threat is not a qualified individual with a disability. As with all affirmative defenses, the employer bears the burden of

proving that the employee is a direct threat." *Rizzo v. Children's World Learning Centers, Inc.*, 213 F.3d 209, 211 (5th Cir. 2000).

Defendant has set forth significant uncontroverted evidence in the form of employer/employee complaints, evaluations, and documentation of mistakes to establish for purposes of the present motion that Plaintiff posed a direct threat to the health and safety of patients. *See, supra; see also, e.g.,* (doc. 62-1, Exhibit A, ¶ 8 (Dusty Ourso, of the Human Resources Department, noting that the hospital received complaints from radiologists that Plaintiff sometimes "appeared to be drugged, was sluggish, was noticeably trying to process what she was being told, had slurred speech, appeared to be sedated and in a fog, was forgetful, [and] was having a hard time focusing" and that the radiologists "were having to scan behind Ms. Antoon frequently because she was missing obvious things such as a miscarriage remaining in one patient's cervix and a nodule in another patient, and because she had mislabeled breasts on a number of occasions")); (doc. 62-3, Exhibit C, ¶ 13 (Cynthia Rabalais, Director of Imaging Services, stating that the hospital had been informed by other ultrasound technologists and radiologists that "Ms. Antoon was acting different, was forgetful, and was making mistakes all of which led them to believe that Ms. Antoon's performance was compromising patient safety")); (doc. 62-4, Exhibit D, ¶¶ 2, 3 (Dr. John Lovretich, radiologist, stating that "[f]ailure to accurately and thoroughly perform an ultrasound can have potentially life-threatening consequences for a patient," and stating that he had informed Ms. Ourso that he

believed Ms. Antoon made more mistakes than any other ultrasound technologist")); (doc. 62-5, Exhibit E, ¶¶ 3-8 (Dr. Maria Gremillion, radiologist, citing numerous incidents involving Plaintiff's "mistakes and deficient performance," and noting that she and Dr. Ruiz informed Defendant that "her performance was placing patients at risk")); (doc. 62-6, Exhibit F, ¶ 3 (Dr. Chester Coles, radiologist, stating that he had informed the hospital that Plaintiff "had begun to appear groggy or in a fog as if she was heavily medicated, that she seemed  distant, that she was noticeably forgetful, and that she was present physically but not always mentally," and further stating that he had informed Defendant that he "believed these characteristics would compromise patient safety")); (doc. 62-7, Exhibit G, ¶¶ 3,6 (Dr. Elizabeth Winters, radiologist, stating that she had informed the hospital administration that "Ms. Antoon was compromising patient safety when she was mislabeling breasts so frequently" and noting that Plaintiff's errors "included, among other things, failing to take standard images for certain exams, taking improper measurements resulting in an ovary appearing normal when it was not, failing to take color images of ovaries making assessment of potentially malignant masses difficult, failure to place proper patient name on images, and inability to locate a patient's left ovary")); (62-8, Exhibit H, ¶¶ 3-4 (Dr. Steven Sotile, radiologist, noting that he informed the hospital that he "scanned behind Ms. Antoon more than any other ultrasound technologist because [he] had the least amount of confidence in Ms. Antoon," and describing mislabeled images, failure to take proper images and

making images not requested)); (doc. 62-9, Exhibit I, ¶¶ 2-3 (Dr. James Ruiz, radiologist, stating that "[f]ailure to accurately and thoroughly perform an ultrasound can have potentially life-threatening consequences for a patient," and noting that Plaintiff had "entirely missed a miscarriage still remaining in the patient's cervix" and also stating that "if Ms. Antoon were scheduled to work call, [he] would most likely come to the hospital to check her scans because he would be anxious otherwise")); (doc. 62-16, Exhibit P, ¶¶ 2-3 (Donna Bodin, Vice President of Employees' Services, noting the hospital's receipt of radiologist complaints, and their statement that "they no longer believed that Ms. Antoon could perform her ultrasound technologist position in accordance with accepted standards-of-care")); (doc. 62-17, Exhibit Q, ¶¶ 5-6 (Sharon Graves, Human Resources Manager, noting that Plaintiff was paid for administrative leave from February 27, 2009 until April 17, 2009, "and even was compensated for call shifts for which she might have been scheduled," and that "[u]pon her return Ms. Antoon was not scheduled for any call shifts, however, Ms. Antoon's fellow ultrasound technologists and the radiologists immediately began to complain regarding her performance issues," including, "among other things, taking too long to perform ultrasounds, lack of familiarity with typical ultrasound equipment and procedures, using the wrong probe for a breast ultrasound, mislabeling, misplacing x-ray documentation, forgetting to print images, poor image quality requiring ultrasounds to be redone, failing to take routine images, appearing sluggish, failure to recognize and image suspicious abnormalities, failing to

image all appropriate and/or requested anatomical areas based on the condition of the patient, failing to differentiate between normal masses and abnormal masses, failing to recognize and image suspicious abnormalities, and failing to correlate a mammogram with ultrasound findings in a patient with a potentially cancerous mass")); (doc. 62-18, Exhibit R, ¶ 3 (Jamie Haeuser, Senior Vice President of Operations, stating that "[c]oncerned for the safety of patients, based on the radiologists' complaints regarding Ms. Antoon's performance issues, I determined that it would be prudent to place Ms. Antoon on administrative leave effective February 27, 2009," and also stating that she approved the recommendation made by the Vice President of Employee Services, Donna Bodin, and Human Resources Manager, Sharon Graves, "that Ms. Antoon be terminated due to the performance issues complained about by the radiologists")).

Attached to the Declaration of Dr. Lovretich are a number of emails sent by Dr. Lovretich to hospital administrators. In the emails he repeatedly complained of problems in Plaintiff's performance of her duties as an ultrasound technologist and recited his accounts of specific instances. The following is an excerpt from one of Dr. Lovretich's emails:

> On Wednesday, 2-18-09, Kathy Antoon presented to me a right breast sonogram on [redacted]. The only 2 images that were recorded were the title page and one image of the UO right breast. Kathy assured me that she took additional images, but when I reviewed the study on the ultrasound machine in US Room C with the patient and Kathy, those same two images were the only ones recorded. I asked Kathy to record more

13

images for the permanent record at least two times. After apologizing to the patient and thanking her for her patience, I started to leave the room when I heard Kathy dismiss the patient ("You can go now . . ."). I re-entered the room and reminded Kathy to record more images from 9-12 o'clock for the permanent record. The patient had not moved (despite Kathy telling her that she was finished) and was looking at Kathy with a bewildered look.

(Doc. 62-4, p. 5).

Attached to the Declaration of Dr. Maria Gremillion are a number of emails sent to hospital administrators complaining of Plaintiffs job performance. The following is an excerpt from one of Dr. Gremillion's emails:[4]

On Monday, July 13, 2009, Kathy Antoon performed a pelvic ultrasound on [redacted]. Kathy presented the case to me and I noticed that three of the images were labeled both right and left ovary. When I questioned Kathy about it she stated she had already fixed it and it should be correct on the images. I had to show her that it was not correct on my images. She stated she had corrected it at her work station several times and acted like she could do nothing else about it. I reminded her throughout the day that it was not correct. Finally, at the end of the day I got another sonographer, Mary, involved. Mary realized that Kathy was not saving the images correctly. This was very distracting and time consuming for the radiologist on a very busy day. Of course, I scanned the patient myself and determined which ovary actually had the cyst on it, but we did not have clear documentation on the images, which is critical.

(Doc. 62-5, Exhibit 2).

Though Plaintiff denies that she posed a direct threat to the safety of others, she has set forth no evidence to controvert the foregoing evidence and establish a genuine dispute of fact as to whether that she posed a direct threat to

---

[4] Similar emails are attached to the declarations of Dr. Chester Coles, Dr. Elizabeth Winters, Dr. Steven Sotile, and Dr. James Ruiz. Only the representative samples above are repeated herein for the sake of brevity.

patients in the performance of her core duties as an ultrasound radiologist. Nor has Plaintiff set forth evidence from which a reasonable fact finder might conclude that a reasonable accommodation would have eliminated the threat to patient safety.[5]

The Court notes that Defendant has not only set forth uncontroverted evidence to establish that Plaintiff was a *potential* threat to the safety of patients entrusted to her care and that her job performance fell below the applicable standard of care for an ultrasound technologist, but Defendant has also set forth specific, uncontroverted evidence of numerous incidents in which Plaintiff failed to follow directions, or to properly make and record images, or to properly label such images. The uncontroverted evidence also establishes for purposes of the present motion that, but for the intervention of other hospital employees or physicians, several of those cited incidents would have significantly compromised patient care and safety. Thus, the Court concludes that no genuine dispute of fact exists as to an essential element of plaintiff's claim of disability

---

[5] Though Plaintiff's psychiatrist, Dr. Charles K. Billings, asserts his opinion that promptly eliminating the weekday call shifts worked by Plaintiff "would more likely than not have allowed her to perform her job" (doc. 70-13, ¶ 8), the Court, based on the undisputed facts, concludes that such an accommodation would have required other ultrasound technologists to work extra weekday call shifts in order to cover the shifts that would otherwise have been worked by Plaintiff. Moreover, the uncontroverted evidence also establishes for purposes of the present motion that defendant's other ultrasound technologists had to repeatedly re-scan patients to prevent incomplete or incorrect diagnoses due to errors or omissions in Plaintiff's work. The ADA does not require an employer to make such accommodations. See *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090 (5th Cir. 1996) (stating that "an accommodation that would result in other employees having to work harder or longer is not required under the ADA"); see also *Burch v. City of Nacogdoches*, 174 F.3d 615 (5th Cir. 1999) (noting "the fact that the ADA does not require an employer to create a new job category for the disabled worker or to adjust co-workers' duties to make them work longer or harder").

discrimination, and that the undisputed evidence in the record establishes, for purposes of the motion, that Plaintiff posed a direct threat to the health and safety of patients.

Accordingly, the Court concludes that Plaintiff was not, during her employment with Defendant, a qualified individual for purposes of the disability discrimination claims she has asserted pursuant to the Americans with Disabilities Act and the Louisiana Employment Discrimination Law, and summary judgment dismissing her claims of disability discrimination is proper.

For the foregoing reasons, the motion shall be granted insofar as Defendant seeks summary judgment dismissing Plaintiff's claims of disability discrimination under the Americans with Disabilities Act and the Louisiana Employment Discrimination Law.

## 2. Harassment

To succeed on a claim of disability-based workplace harassment under the ADA, "a plaintiff must demonstrate (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action." *Gowesky v. Singing River Hosp. Systems*, 321 F.3d 503, 509 (5th Cir. 2003).

As is noted *supra*, the Court has concluded, for purposes of the present motion, that Plaintiff was not, during her employment with Defendant, a qualified individual for purposes of claims asserted pursuant to the Americans with Disabilities Act.   Thus, Plaintiff has failed to establish a genuine dispute of material fact as to whether she belongs to a protected group under the Act. Because Plaintiff has failed to establish a genuine dispute of material fact as to an essential element of her claim of harassment under the ADA, summary judgment shall issue, dismissing Plaintiff's claim of harassment.

## 3. Retaliation

The ADA prohibits discrimination based on retaliation when an "individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing . . . ."   42 U.S.C. § 12203.  The procedure for analyzing a claim of retaliation involves the same burden-shifting analysis used in considering discrimination claims.  First, the plaintiff must make a *prima facie* case of retaliation.    To make a *prima facie* showing, the plaintiff must prove: (1) that he or she engaged in a protected activity; (2) that an adverse employment action occurred; and (3) that a causal link exists between the protected activity and adverse employment action.   See *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 & n.8 (5th Cir. 1998). The burden then shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action.  *Id.* At 1123.  Once the employer satisfies that burden, the

burden then shifts back to the plaintiff who "must adduce sufficient evidence that would permit a reasonable trier of fact to find that the proffered reason is a pretext for retaliation." *Id.*

Assuming, without deciding, that Plaintiff has made a *prima facie* showing of retaliation, Woman's Hospital's has articulated legitimate, non-discriminatory reasons for terminating Plaintiff's employment. The evidentiary grounds of the articulated reasons are well documented *supra*. Because Defendant has offered legitimate, non-discriminatory rationales for the adverse employment action, the burden shifts back to Plaintiff to show that the adverse employment actions would not have occurred "but for" her EEOC claims and requests for accommodations. See *Sherrod*, 132 F.3d at 1123. Plaintiff has not directed the Court to any evidence with which she might carry that burden.

Accordingly, the Court concludes that no genuine dispute of material fact exists, and summary judgment shall issue dismissing Plaintiff's claim of retaliation.

### 4. Negligent Infliction of Emotional Distress

"To assert a cause of action for negligent infliction of emotional distress, there must be proof that the defendant violated some legal duty owed to the plaintiff[ ], who must also meet the heavy burden of proving outrageous conduct by the defendant." *Doe* v. *Dunn,* 890, So.2d 727, 730 (La.App.2d 2004) (citing *Succession of Harvey,* 716 So.2d 911 (La.App.4[th] 1998).

In addressing the claims for negligent and intentional infliction of emotional distress, Plaintiff's memorandum in opposition to the motion for summary judgment states only that "[t]hese facts are more than sufficient to set forth triable claims under Louisiana law for both intentional and negligent infliction of emotional distress" (doc. 70, p. 30).  Plaintiff references that same conclusory allegation in her sur-reply, and further opines that "this case shows conduct which is more severe and/or pervasive than the disability-based harassment found to be actionable by the Fifth Circuit in *Flowers v. Southern Regional Physicians Services, Inc.*, 247 F.3d 229 (5th Cir. 2001)" (doc. 77, p. 19).[6]

Thus, Plaintiff has not directed the Court to the specific legal duty upon which her negligent infliction of emotional distress claim is grounded, much less to evidence to support that essential element of her claim.  Insofar as Plaintiff may attempt to ground her emotional distress claims on a duty imposed by the Americans with Disability Act or the Louisiana Employment Discrimination Law, for all of the reasons provided *supra*, Plaintiff has failed to carry that burden. Insofar as the claim may be grounded in disciplinary actions taken by Defendant, the Court notes that when Plaintiff was asked at her deposition if she was disciplined unfairly for making mistakes, she responded, in pertinent part, by saying "[n]o, I don't say that I was disciplined unfairly" (doc. 62-2, p. 69).

---

[6] The Court notes that the Fifth Circuit, in *Flowers*, found that the plaintiff "failed to present any evidence of actual [emotional] injury such as would entitle her to an award of more than nominal damages."  247 F.3d at 239.

Moreover, plaintiff has failed to direct the Court to specific evidence with which to carry her burden of establishing a genuine dispute of material fact with regard to her "heavy burden" of establishing outrageous conduct on the part of Defendant.

Accordingly, the Court concludes that Plaintiff has failed to carry her burden of setting forth specific evidence to establish a genuine dispute of fact with regard to either element of a claim for negligent infliction of emotional distress.[7]

### 5. Intentional Infliction of Emotional Distress

> The essential elements of an IIED claim are: (1) intent to cause (2) severe emotional distress by (3) extreme and outrageous conduct. *White v. Monsanto Co.*, 585 So.2d 1205 (La.1991). "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* at 1209. Merely tortuous or illegal conduct does not rise to the level of extreme and outrageous. *Nicholas v. Allstate Ins. Co*, 765 So.2d 1017. Thus, "[l]iability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *White*, 585 So.2d at 1209. "The distress suffered must be such that no reasonable person could be expected to endure it." *Id.* at 1210.

*Phillips v. Lafayette Parish School Bd.*, 54 So.3d 739, 743-44 (La.App.3d 2010).

---

[7]The Court also notes that "[i]nadequately briefed issues are deemed abandoned." *United States v. Charles*, 469 F.3d 402, 408 (5th Cir. 2006) (citing, *Dardar v. Lafourche Realty Co.*, 985 F.2d 824, 831 (5th Cir. 1993) (citing, *Friou v. Phillips Petroleum Co.*, 948 F.2d 972, 974 (5th Cir. 1991); *Harris v. Plastics Mfg, Co.*, 617 F.2d 438, 440 (5th Cir. 1980)); see also, e.g., *Association of American Physicians & Surgeons, Inc. v. Texas Medical Bd.*, 627 F.3d 547, 551 (5th Cir. 2010) (stating that a party which "neither briefed nor argued" an issue had abandoned it); *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 543 (5th Cir. 2008) (stating that "[w]e deem the un-briefed claims to be abandoned"); *Askanase v. Fatjo*, 130 F.3d 657, 668 (5th Cir. 1997) (stating that "[a]ll issues not briefed are waived").

As is noted *supra*, Plaintiff has not directed the Court to any specific evidence to support her claim of intentional infliction of emotional distress, and the Court has found insufficient evidence to establish any of the three elements of a claim of such a claim.

Accordingly, the motion for summary judgment on the claim of intentional infliction of emotional distress shall be granted.

## CONCLUSION

For all of the foregoing reasons, the motion by Defendant, Woman's Hospital Foundation, for summary judgment (doc. 62) is **GRANTED**. Judgment shall issue separately, dismissing this matter with prejudice.

Baton Rouge, Louisiana, March 30, 2012.


BRIAN A. JACKSON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA